COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| STATE OF TEXAS, | § | No. 08-20-00180-CR |
| | | |
| Appellant, | § | Appeal from the |
| | | |
| v. | § | 243rd Judicial District Court |
| | | |
| RAMON P. ASTORGA, JR., | § | of El Paso County, Texas |
| | | |
| Appellee. | § | (TC# 20190D06768) |

## **O P I N I O N**

When a tribal police officer has probable cause to believe that a non-Indian motorist has violated state or federal law on tribal lands, the tribal police can detain the motorist for a reasonable period of time until state or federal law enforcement arrives. *U.S. v. Cooley*, 141 S.Ct. 1638, 1646 (2021). In this case, following a traffic stop, tribal police discovered drug paraphernalia in Appellee Ramon Astorga's car, and they handcuffed, Mirandized, and transported him to tribal police headquarters. Following a strip search, tribal police discovered a quantity of methamphetamine on his person. Only at that point, did the tribal police contact the El Paso Police Department ("EPPD"). The trial court concluded that the tribal police illegally arrested Astorga which tainted the subsequent discovery of the narcotics. We conclude that the State has failed to

present a record showing the tribal police acted within the limited authority that *Cooley* allows respecting the detention of non-Indians. Accordingly, we affirm the suppression order below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Astorga was indicted in state district court on one count of possession of methamphetamine, a controlled substance, with the intent to deliver. The methamphetamine was found on Astorga's person during a search by officers of the Ysleta del Sur Pueblo Tribal Police Department after they stopped him for committing an alleged traffic violation on the Ysleta del Sur Pueblo (the "Pueblo") located within El Paso County.

### A. The Traffic Stop[1]

Around 12:30 p.m. on January 30, 2019, Ysleta Tribal Officer Julian Alarcon saw Astorga, a non-Indian, driving off the parking lot of the Speaking Rock Entertainment Center located on the Ysleta Pueblo. Astorga allegedly failed to use his turn signal as he turned from the parking lot onto a roadway within the Pueblo. The failure to use a turn signal in this situation is a civil infraction under the Tribe's Traffic Code. Officer Alarcon initiated a traffic stop, but Astorga did not stop until he had travelled onto a public roadway off the Pueblo, located in the City of El Paso. There is no dispute here that Officer Alarcon had the authority to enforce the Tribe's Traffic Code on property adjacent to the reservation if the violation initially occurred on tribal land.

A second tribal officer, identified as Officer Villar, arrived on the scene to assist with the stop. Officer Alarcon approached the driver's side of the vehicle, while Officer Villar approached the passenger side. Astorga had a female passenger with him. While speaking with Astorga's female passenger, Officer Villar observed two open alcoholic beverage containers in the vehicle,

---

[1] We take the facts in this case primarily from the testimony given and exhibits admitted at the suppression hearing, a dashcam video recording that was made at the scene of the stop, and the extensive findings of fact made by the trial court.

2

which constituted a civil infraction under the Tribe's Traffic Code. Based on the presence of the open containers, Officer Alarcon ordered Astorga to step out of his vehicle to conduct a further investigation. Officer Alarcon testified that upon seeing the open containers, he believed it necessary to determine whether Astorga had been driving under the influence, which is also a civil violation of the Tribe's Traffic Code. However, there is nothing in the record to indicate that Astorga was in fact driving under the influence.

Officer Alarcon's dash cam video shows he conducted a brief pat-down search of Astorga. At about this time, a third tribal officer, identified as Sergeant Perez, arrived on the scene and remained next to Astorga while Officer Alarcon retrieved the open containers from the vehicle. Shortly thereafter, Officer Villar informed Officer Alarcon that he had found a clear glass pipe on the floorboard of the passenger seat of the vehicle. Based on his training and experience, Officer Alarcon believed that the pipe contained residue indicating that it had been used to smoke methamphetamine; he therefore suspected that Astorga had committed an additional civil infraction in violation of the Tribe's Peace Code, which governs non-traffic offenses occurring on tribal land. Officer Alarcon testified that the focus of his investigation shifted at that time from enforcing the Traffic Code to enforcing the Peace Code with respect to Astorga's suspected possession of drug paraphernalia.

Sergeant Perez thereafter handcuffed Astorga, and conducted a more thorough search of Astorga's person, which Officer Alarcon described as a "search incident to arrest." No drugs were found on Astorga during this search. A records check showed the female passenger had an outstanding arrest warrant for aggravated assault with a deadly weapon.[2] Officer Alarcon further testified that he read both Astorga and the female passenger their *Miranda* rights, and they were

---

[2] The female passenger initially provided a false name to the tribal officers, and when she eventually provided her real name, the warrant against her was discovered.

3

both transported for "processing" to the tribal police headquarters, located approximately a half mile away from the traffic stop's location. The timestamps on the dashcam video shows the traffic stop--from when Officer Alarcon exits his vehicle until he arrives with Astorga back at tribal police headquarters--took 39 minutes.[3]

## B. Events at Tribal Police Headquarters

At the tribal police headquarters, pursuant to their standard policy, tribal officers conducted yet another search of Astorga for safety reasons, before placing him in a jail cell. No drugs were found on Astorga's person during that search.

However, while Astorga was in the jail cell, his female passenger informed one of the tribal officers that Astorga was concealing methamphetamine in his "groin" or "genital area." The tribal officers then asked Astorga to remove his pants, and the officers observed a "bulge" in his underwear, which Astorga attributed to a "hernia." Not believing his story, the tribal officers asked Astorga to take off his underwear, and at that time, the officers observed a baggie containing a "crystal-like" substance; upon testing, the tribal officers determined that the substance was methamphetamine. Officer Alarcon testified that it was "at this point," that the matter was "turned over to the El Paso Police Department." An incident report from the El Paso Police Department documents that they were called at 5:10 p.m.[4] A chain of custody document shows that an EPPD officer took possession of the suspected methamphetamine at 5:44 p.m. According to the EPPD's incident report, Office Villar informed EPPD officers upon arrival that he had placed Astorga

---

[3] Officer Alarcon's written incident report states that he initiated the traffic stop at approximately 12:24. The time stamps on the dash cam video show the stop at 13:28 (military time). We assume either Officer Alarcon's report is inaccurate as to the time, or the time stamp on the dashcam is off because it does not account for changes in daylight savings time.

[4] All the times noted on the various reports were in military time, so the EPPD report states: "Date/Time Reported" as "WE Jan 30, 2019  17:10." We have converted all the times to the more conventional AM and PM times.

under arrest for possession of drug paraphernalia. The EPPD placed him under arrest for possession of a controlled substance at 8:18 p.m.

Officer Alarcon's final incident report reflected that he did not issue a citation to Astorga for the drug paraphernalia offense. Instead, the report indicates that he issued two civil citations to Astorga under the Tribe's Traffic Code for the turn-signal and open container violations and also cited Astorga for possession of illegal drugs under the Peace Code. He cited the female passenger for possession of paraphernalia in violation of the Tribe's Peace Code.

### C. State Court Proceedings and the Motion to Suppress

Astorga was subsequently indicted in state court on one count of the first-degree felony offense of possession of a controlled substance, methamphetamine, with the intent to deliver, in an amount more than 4 ounces but less than 200 ounces, in violation of the Texas Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.112; 481.102(6). Shortly after being indicted, Astorga filed a motion to suppress any evidence resulting from the traffic stop, alleging that the stop was illegal and that he was unlawfully detained for longer than was reasonably necessary to investigate the initial reason for the stop. Officer Alarcon and Astorga testified at the hearing; the trial court also received in evidence the incident and police reports, along with the Tribe's Traffic and Peace Codes.

The trial court granted Astorga's motion to suppress. In its findings of fact, the court first found that the tribal officers' initial traffic stop was lawful, based on the tribal officer's perception of a violation of the Tribe's Traffic Code (failure to use a turn signal when exiting a parking lot on tribal land). The trial court further recognized that it was a violation of the tribal Codes to have open containers in the vehicle and to possess drug paraphernalia. However, the trial court concluded that the tribal officers had no authority to arrest Astorga for those violations, and at

5

most they could issue civil citations and to thereafter release him. In turn, the trial court noted that Officer Alarcon vacillated in his testimony regarding whether he arrested Astorga or whether he merely detained him; however, the court concluded that despite any testimony to the contrary, Officer Alarcon did in fact unlawfully arrest Astorga.

The trial court therefore concluded that because the tribal officers acted illegally in arresting Astorga, the body search that occurred at the tribal police headquarters was also illegal and violated Astorga's right to be free from an "unlawful search and seizure." Accordingly, the court granted Astorga's motion to suppress the methamphetamine that was found during that search, concluding that it was found as a direct result of the illegal arrest and detention.

## II. ISSUES ON APPEAL

On appeal, the State contends that the trial court erred in granting the motion to suppress, raising two issues. In Issue One, the State contends that the trial court erred in ruling that the tribal officers did not have the authority to detain Astorga, contending that the detention was lawful under the Tribe's Peace Code, under state law, and under the Fourth Amendment. In particular, the State contends that tribal officers had the legal authority to conduct an investigation into whether Astorga had committed a violation of state law on tribal land, and to detain him until EPPD officers could arrive to take custody of him. In Issue Two, the State contends that the trial court erred by concluding that the search that took place at the tribal police headquarters was unlawful, contending that it was reasonable under Fourth Amendment standards.

## III. STANDARD OF REVIEW

Appellate courts review a trial court's ruling on a motion to suppress under a bifurcated standard. *See State v. Arellano*, 600 S.W.3d 53, 57 (Tex.Crim.App. 2020). Under that standard, we must give "almost total deference to a trial court's determination of the historical facts that the

6

record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997) (en banc). This same level of deference is accorded to a trial court's ruling on "application of law to fact questions," or "mixed questions of law and fact," if the resolution of those questions turns on an evaluation of credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007), *quoting Montanez v. State*, 195 S.W.3d 101, 106 (Tex.Crim.App. 2006). But we review de novo the trial court's determination of legal questions and the application of the law to facts that do not turn upon a determination of witness credibility and demeanor. *Arellano*, 600 S.W.3d at 57-58. These standards apply to the question of the reasonableness of either a temporary investigative detention or an arrest. *Amador*, 221 S.W.3d at 673; *see also Wexler v. State*, 625 S.W.3d 162, 167 (Tex.Crim.App. 2021) (court makes a de novo determination of the legal issue of whether a person was in custody in resolving a motion to suppress).

We will uphold the trial court's judgment if it is correct on any theory of the law applicable to the case, even if the trial judge made the judgment for a wrong reason. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990) (en banc). However, a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it. *See Martinez v. State*, 91 S.W.3d 331, 336 (Tex.Crim.App. 2002) (appellate courts may uphold a trial court's ruling on any legal theory or basis applicable to the case, but usually may not reverse a trial court's ruling on any theory or basis that might have been applicable to the case but was not raised in the trial court).

## IV. ERROR PRESERVATION

Before addressing the merits of the State's arguments, we first answer Astorga's procedural arguments where he claims the State has forfeited its claimed error based on error preservation and briefing deficiencies. We find no merit in either of these claims.

### A. Preservation in the Trial Court

Astorga first argues that the State did not preserve any claim that the tribal officers had the authority to detain and search him for potential state law violations committed on tribal land, because it was not argued below. To preserve an issue for appellate review, the complaining party must make its argument with sufficient specificity in the trial court to alert the trial court to its complaint. *See* TEX.R.APP.P. 33.1(a)(1)(A) (stating that a party preserves an appellate complaint for review if it "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint[.]"). We agree with the State that it provided the trial court with sufficient notice that it was seeking to justify Astorga's detention, at least in part, on the theory that Officer Alarcon had the authority to detain him to investigate potential state law violations until EPPD officers could arrive to take custody of him.

First, although Officer Alarcon's testimony was not entirely consistent, he testified at the suppression hearing that he believed tribal officers are allowed to investigate and detain an individual suspected of committing a state law violation on tribal land, and to turn over custody of the individual to a state agency for prosecution of those laws. Second, and more importantly, following the suppression hearing and with the trial court's permission, the State submitted additional briefing in which it expressly argued that tribal police have the authority to temporarily detain an individual who is suspected of committing a state law violation on tribal land until such time as EPPD officers arrive to take custody of the individual. The issue was raised with sufficient

8

specificity that the court could have addressed the issue and was therefore properly preserved in the trial court.

## B. The Multifarious Challenge

Astorga also contends that the State's first issue on appeal is "multifarious," as it raises at least two separate and distinct legal theories for finding that Astorga's detention was lawful. Astorga therefore contends that the State did not preserve this issue for our review. We disagree.

A multifarious issue embraces more than one specific ground. *State v. Frias*, 511 S.W.3d 797, 806-07 (Tex.App.--El Paso 2016, pet. ref'd), *citing Mays v. State*, 318 S.W.3d 368, 385 (Tex.Crim.App. 2010). By combining more than one contention in a single issue, an appellant risks rejection on the ground that nothing is presented for review. *See Wood v. State*, 18 S.W.3d 642, 649 n.6 (Tex.Crim.App. 2000) (refusing to address multifarious grounds). A court, however, has the discretion to address contentions presented in a multifarious issue if they are sufficiently developed in the brief such that we can determine with reasonable certainty the nature of the complaining party's point of error. *Id.*; *see also Rich v. Olah*, 274 S.W.3d 878, 885 (Tex.App.--Dallas 2008, no pet.) (court may consider a multifarious issue if it can determine, with reasonable certainty, the error about which complaint is made).

As the State points out, its first point of error is not multifarious as it only addresses the single issue of whether the trial court erred in finding that Astorga was illegally detained and searched. The State then supported this single point of error by arguing that the tribal police officers were authorized under a variety of laws, including tribal, federal, and state laws to detain Astorga on the drug paraphernalia offense until EPPD officers could arrive to take custody of him. Each of these theories are all directed at supporting the general proposition that the trial court erred in finding that the tribal officers did not have the authority to detain and search Astorga.

9

Moreover, even if we were to conclude that the State's separate arguments on this subject rendered the issue multifarious, this would not prevent us from reviewing the State's complaint, as the State set forth its legal theories in support of the detention in separate subsections, all of which are sufficiently developed such that we can easily determine, with reasonable certainty, the nature of the State's point of error.

## V. VALIDITY OF ASTORGA'S DETENTION

Following the temporary detention of the traffic stop, the actions of the tribal police are explained in one of three ways: (1) they detained Astorga pending intervention by the EPPD; (2) they detained Astorga to investigate violations of state or tribal law; or (3) as found by the trial court, they unlawfully arrested Astorga. To understand each of these options, we first step-back to discuss the authority of tribal police in dealing with non-Indians on tribal lands.

### A. Applicable Law

#### 1. The Tribe's delegation of criminal jurisdiction to the State of Texas

The Ysleta del Sur Pueblo is a federally recognized tribe under 25 U.S.C. § 1300g-1-7, and, like other Indian tribes, they have the status of a "domestic dependent nation[]." *Holguin v. Ysleta del Sur Pueblo*, 954 S.W.2d 843, 846 (Tex.App.--El Paso 1997, pet. denied); *see also Cooley*, 141 S.Ct. at 1642 (recognizing the "dependent" status of Indian tribes). Although Indian tribes are considered "distinct, independent political communities" exercising sovereign authority, due to their incorporation into the United States, their sovereignty is of a "unique and limited character." *Cooley*, 141 S.Ct. at 1642. In particular, not only are Indian tribes subject to the plenary authority of Congress, but they also lack inherent authority to exercise criminal jurisdiction over non-Indians, even for offenses committed on tribal land. *Id.*

10

As Astorga points out, there are a multitude of federal laws, regulations, and treaties, which delegate authority to outside agencies to exercise criminal jurisdiction over crimes committed on the various Indian reservations located within the United States. Depending on the particular tribe, the authority may be vested in the state in which the tribe's land is located, the federal government, or in some instances, both. The Ysleta Pueblo Tribe expressly consented to allow the State of Texas to exercise criminal jurisdiction over state law violations committed on the Pueblo through an Act of Congress, referred to as the "Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act" or simply "the Restoration Act."[5] *See Silva v. Ysleta del Sur Pueblo*, 28 S.W.3d 122, 124-25 (Tex.App.--El Paso 2000, pet. denied), *citing* 25 U.S.C. § 1300g-4 (f) (2000). The Restoration Act expressly provides that: "The State shall exercise civil and criminal jurisdiction within the boundaries of the reservation as if such State had assumed such jurisdiction with the consent of the tribe under Sections 1321 and 1322," (the latter two references are also referred to as Public Law 280). *See also Texas v. Ysleta del Sur Pueblo*, 79 F.Supp.2d 708, 711 (W.D. Tex. 1999), *aff'd sub nom. State v. Ysleta del Sur*, 237 F.3d 631 (5th Cir. 2000) (recognizing that the State of Texas was given the authority to exercise criminal jurisdiction over state law offenses committed on the Ysleta Pueblo, according to the terms of Public Law 280, through the Restoration Act).

Accordingly, it is undisputed that the State of Texas has criminal jurisdiction over state law crimes occurring on Ysleta Pueblo, and that the Tribe has no authority to criminally prosecute any offenses committed by non-Indians on the Pueblo.

---

[5] This provision was omitted from the current version of the United States Code, but it appears to still be in effect. *See Texas v. Alabama-Coushatta Tribe of Texas*, 918 F.3d 440, 442 n.1 (5th Cir. 2019), *cert. denied* 140 S.Ct. 855 (2020).

11

## 2. *The Tribe's civil jurisdiction*

Despite lacking criminal jurisdiction, the Tribe nevertheless has jurisdiction to impose civil sanctions on both Indians and non-Indians who violate the Tribe's Traffic and Peace Codes.

### a. The Tribe's Traffic Code

The Ysleta Pueblo's Traffic Code provides that the Tribe has "inherent powers" to exercise "civil authority over the conduct of any person operating motor vehicles on the Reservation[.]" The Traffic Code contains a list of various traffic rules, the violation of which are considered "civil infractions" and subject a person to a "civil assessment" or monetary fine. [6] It further provides that the Traffic Code "shall be enforced by the Ysleta del Sur Pueblo Tribal Police Department and its tribal law enforcement officers." Subject to certain exceptions not relevant herein, the Traffic Code only allows tribal officers to issue civil citations to individuals committing violations of the Traffic Code on tribal land, and if the person makes a written promise to appear before a magistrate by signing the citation and notice to appear, the officer must release the person.

### b. The Tribe's Peace Code

The Tribe's Peace Code contains a list of non-traffic offenses, the violation of which are also considered civil infractions for which a tribal officer may issue a citation. The Peace Code groups infractions into different classes, each setting forth a specific amount of civil assessment that may be imposed.[7] Unlike the Traffic Code, the Peace Code does not expressly state that a

---

[6] In certain instances, in addition to the imposition of a fine, a tribal court may "grant such other relief as is necessary and proper, including, but not limited to the following: restrict driving privileges within the Ysleta del Sur Pueblo, community service, restitution, treatment/counseling, driving courses, traditional sanctions, loss of driving privileges within the exterior boundaries of the Ysleta del Sur Pueblo and or expulsion from tribal properties."

[7] Like the Traffic Code, section 4.2.10 of the Peace Code also allows a civil court to grant other relief, to include the performance of community service, restitution, entry into treatment programs, and even expulsion from tribal land. In addition, section 4.2.80 provides for the seizure or forfeiture of property used in the commission of a violation of the Code.

12

tribal officer may only cite and release an individual who is suspected of a violation; on the other hand, however, it does not expressly give the tribal officer the authority to detain an individual for investigative purposes.

Relevant to our purposes, an action taken under the Peace Code "does not preclude other possible actions under another [section] of this code nor a criminal action by another jurisdiction." In other words, the Peace Code recognizes the right of other jurisdictions, such as the State of Texas, to exercise criminal jurisdiction over offenses committed on the Pueblo. It does not, however, elaborate on what tribal officers have the authority to do when confronted with a situation in which they suspect a non-Indian individual has committed a state law offense on the Pueblo. As explained below, however, the United States Supreme Court recently addressed this issue, setting out the authority of a tribal officer's inherent right to detain and search a non-Indian suspected of committing a criminal offense on tribal land, as well as the limits of that authority, in *United States v. Cooley*.[8] *Cooley*, 141 S.Ct. at 1641.

### 3. *United States v. Cooley*

In *Cooley*, a tribal officer observed a truck parked on a public right-of-way on tribal land and initiated a welfare check to determine if the occupants needed assistance. *Id*. at 1642. Upon approaching the vehicle, the tribal officer noted that Cooley, a non-Indian who was in the driver seat, had bloodshot and watery eyes, and further observed that he had two semiautomatic weapons in the front seat of his vehicle. *Id.* After ordering Cooley out of his truck and conducting a pat-down search for safety reasons, the tribal officer contacted other tribal and county officers for assistance. *Id.* While waiting for the other officers to arrive, the tribal officer observed a glass pipe and a plastic bag of methamphetamine in the vehicle. *Id.* After the other officers arrived on

---

[8] Although *Cooley* was decided after the parties submitted their briefs in this matter, they have both submitted letter briefs discussing the court's ruling.

13

the scene, including an officer from the federal Bureau of Indian Affairs, the tribal officer transported Cooley to tribal headquarters where he was questioned by local and federal officers. Cooley was later indicted in federal court on drug and gun offenses. *Id.*

A federal district court granted Cooley's motion to suppress the evidence found at the scene, contending that the tribal officer had no authority to investigate "nonapparent violations" of state or federal law by a non-Indian on a public right-of-way on a reservation, and the Ninth Circuit affirmed. *Id.* In reversing, the Supreme Court first noted that although an Indian tribe lacks the authority to exercise criminal jurisdiction over non-Indians, it nevertheless has the inherent sovereign authority to exercise "policing authority" on tribal land for the "health or welfare of the tribe." *Id.* at 1644, *citing Montana v. United States*, 450 U.S. 544, 565-66 (1981) and *Strate v. A-1 Contractors*, 520 U.S. 438, 456-459 (1997). The Court recognized that to hold otherwise would make it "difficult for tribes to protect themselves against ongoing threats." *Cooley*, 141 S.Ct. at 1643. The Court therefore held, as it has in the past, that "[w]here jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities." *Id.* at 1644, *citing Duro v. Reina*, 495 U.S. 676, 697 (1990). And in turn, it recognized that the authority to search a non-Indian prior to transport is "ancillary to [this] authority." *Cooley*, 141 S.Ct. at 1644. The Court therefore held that the tribal officer acted within his authority in detaining and conducting a limited pat-down search of Cooley while waiting for the appropriate authorities to arrive on the scene. *Id.* at 1646.

In reaching this conclusion, the Court noted that although a tribe has no authority to subject a non-Indian to its jurisdiction, the tribal officer's detention and search of Cooley did not subject him to tribal law, and instead only subjected him to the applicable federal criminal laws that would govern Cooley regardless of whether he was on or off a reservation. *Id.* at 1645. Similarly, the

14

Court reviewed the various congressional regulations and limitations on a tribe's authority over non-Indians and concluded that there was nothing in any of those regulations indicating that Congress intended to take away a tribe's inherent policing authority. *Id.* at 1646. However, as summed up by Justice Alito in his concurring opinion, a tribal officer's policing authority only extends to the right to detain an individual suspected of committing a state or federal offense on a tribal reservation "for the period of time reasonably necessary for a non-tribal officer to arrive on the scene," and to conduct a search only "to the extent necessary to protect" the officer and others while at the scene of the detention. *Id.* at 1646 (Alito, J., concurring).

Accordingly, the question for our resolution is whether the tribal police officers in the present case were in fact exercising this limited policing authority under *Cooley* when they detained and searched Astorga. For the reasons set forth below, we conclude that although the initial detention and pat-down search at the scene of the traffic stop may have been authorized under *Cooley*, the State has failed to show that the tribal officers' subsequent actions stayed withing the bounds of what *Cooley* allows.

**B. Analysis**

*1. Authority to conduct the initial traffic stop*

We agree with the trial court that the tribal officers had the authority to conduct the initial traffic stop and to engage in a limited detention and investigation at the scene of the stop, as part of their policing authority. *See generally Medina v. State*, 565 S.W.3d 868, 876 (Tex.App.--Houston [14th Dist.] 2018, pet. ref'd) (recognizing police authority to detain a person for a routine traffic stop for the purpose of investigating the stop, and to take action necessary to ensure the safety of the police and others in the area), *citing Rodriguez v. United States*, 575 U.S. 348, 354 (2015). It is undisputed that Officer Alarcon observed Astorga pull out of the parking lot of the

15

Tribe's Speaking Rock Entertainment Center and turn onto a roadway located on tribal land without using a turn signal. Astorga conceded in the trial court the Tribe's Traffic Code makes it a civil infraction to fail to use a turn signal in that circumstance.

It is also undisputed that Officer Villar, who assisted Officer Alarcon at the scene of the traffic stop, observed open alcoholic beverage containers in Astorga's vehicle in plain view at the scene of the stop. And, in turn, the Traffic Code provides that having open containers of alcohol in a vehicle is a civil infraction. If these had been the only civil infractions observed by the officers, it appears that the tribal officers would have had no choice but to issue citations to Astorga, and to thereafter release him as required by the Tribe's Traffic Code.[9]

### 2. Discovery of the drug paraphernalia

However, while Officer Alarcon was investigating the Traffic Code violations, Officer Villar observed a glass pipe in the vehicle, which the tribal officers believed was used to ingest methamphetamine. And in turn, the Tribe's Peace Code make it a civil infraction, carrying a fine of $2,000 to possess either "illegal drugs" or "drug paraphernalia." In addition, possession of drug paraphernalia is also a violation of state law. *See* TEX.HEALTH & SAFETY CODE ANN. § 481.125(a)(d) (providing that the possession of drug paraphernalia with the intent or purpose to "inject, ingest, inhale, or otherwise introduce into the human body a controlled substance" is a Class C misdemeanor). And, although possession of paraphernalia is only classified as a Class C misdemeanor under Texas law, making it a fine-only offense, an EPPD officer has the discretion to either issue a citation for the offense or make a custodial arrest and take the suspect before a

---

[9] The same can be said of Texas law as possession of an open container of an alcoholic beverage is a Class C misdemeanor. TEX.PENAL CODE ANN. § 49.031(d). The Texas Penal Code expressly provides that a peace officer charging a person with this offense, "instead of taking the person before a magistrate, shall issue to the person a written citation and notice to appear," and that the officer "shall release the person" if he makes a written promise to appear before a magistrate by signing the citation. TEX.PENAL CODE ANN. § 49.031(e).

16

magistrate. *See* TEX.CODE CRIM.PROC.ANN. art. 14.06(b) (subject to exceptions not relevant herein, a state law enforcement officer "*may*, instead of taking the person before a magistrate, issue a citation" to appear before a magistrate to a person suspected of committing a Class C misdemeanor); *see also* 40 TEX.PRAC., CRIMINAL PRACTICE AND PROCEDURE § 10:25 (3d ed. 2020) (noting that article 14.06 appears to leave entirely to the officer's discretion whether to make a custodial arrest or issue a citation for a Class C misdemeanor).

Accordingly, the tribal officers could have contacted the EPPD or other state officers to determine if they wished to take custody of Astorga for the alleged drug paraphernalia offense. And if they had done so, they would have neatly fit the fact pattern in *Cooley* by temporarily detaining Astorga at the scene until EPPD officers arrived. But this is not what happened.

### 3. *Cooley distinguished: the delay in contacting the EPPD and uncertain purpose of the detention*

Astorga carried the initial burden of rebutting the presumption of proper police conduct, which he did by testifying that the search or seizure occurred without a warrant. *See Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App. 2005). At that point, the burden of proof shifted to the State to establish that the search or seizure was reasonable. *Id*. While the State relies on a *Cooley* type detention to show that reasonableness, the record does not support the claim. Unlike *Cooley*, the record does not show the tribal officers called the EPPD at the scene of the traffic stop. And unlike *Cooley*, no outside agency instructed the tribal police to transport Astorga to tribal headquarters for further questioning. Instead, the record before us shows the passage of several hours before the EPPD was contacted.

The stop was initiated just before 12:30 p.m. The stop and investigation at the scene took some 40 minutes. Yet, the EPPD incident report notes that the first call to them was made at 5:10 p.m. And the call reported possession of a controlled substance, meaning that the EPPD was not

17

contacted until *after* the tribal officers discovered the methamphetamine on Astorga's person during the strip search that occurred at tribal police headquarters. Officer Alarcon made the same admission in his suppression hearing testimony. So unlike the tribal officers' actions in *Cooley,* the State here is unable to show that the initial detention of Astorga--for more than four hours--was for the purpose of contacting the EPPD to let them take control of the situation, or to take custody of Astorga on the alleged state law violation.

Moreover, the State conceded at oral argument that the tribal police did not take Astorga back to their headquarters as a part of an investigation of the paraphernalia offense; any investigation of the paraphernalia ended at the scene of the traffic stop. The trial court found that Officer Alarcon disclaimed any intent to test the residue in the glass pipe because he testified that "[W]e don't do that in our policy or any procedure. We are a civil court." The trial court's fact findings also expressly discount Officer Alarcon's claims that he was only detaining Astorga pending a further investigation. As the trial court pointed out, that claim was inconsistent with Officer Alarcon's testimony that he performed a search incident to arrest. It was also inconsistent with Officer Villar's claim that Astorga was arrested for possession of paraphernalia.

Finally, an investigative detention is limited to temporarily detaining a person reasonably suspected of criminal activity, for no longer than is necessary, and by the least intrusive means possible, in order to determine identity or to momentarily maintain the *status quo* in order to garner more information. *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); *Davis v. State*, 947 S.W.2d 240, 244-45 (Tex.Crim.App. 1997) (en banc); *see also Smith v. State*, 945 S.W.2d 343, 346-47 (Tex.App.--Houston [1st Dist.] 1997, pet. ref'd) (explaining that passage of time must be considered along with law-enforcement purposes to be furthered by detention, and amount of time reasonably necessary to carry out such purposes). Accordingly, even if the tribal officers detained Astorga as

18

a part of some investigation, the State has failed to present evidence to support the reasonableness of the detention here, either as to the length of the detention or that is involved the least intrusive means.

The other alternative is what the trial court concluded: tribal police unlawfully arrested Astorga. In several findings, the trial court recites that Astorga was handcuffed, read his *Miranda* rights, searched "incident to arrest," had his personal possessions seized, was taken in a patrol car to the tribal police headquarters, and there placed in a holding cell. And whether termed an arrest or detention, there is little doubt that a reasonable person, judged by the standards of someone who is innocent of any crime, would have believed he was not free to leave. *See Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex.Crim.App. 1996) (setting out test for what constitutes an arrest); *see also Scott v. State*, 572 S.W.3d 755, 761-62 (Tex.App.--Houston [14th Dist.] 2019, no pet.) (where officers handcuffed DWI suspect, searched and towed his car, placed him in a patrol car, and transported him to a police station six or seven miles away, the officers effected an arrest despite officer's statement to the contrary). At the time Astorga was taken to the tribal police headquarters, he was potentially guilty of only civil charges under the Tribe's Traffic and Peace Codes, or state law class C misdemeanors. As we discuss above, tribal police had no authority to arrest Astorga on those violations. Officer Alarcon himself acknowledged at the suppression hearing that he had no authority to arrest Astorga.[10]

---

[10] At the suppression hearing, Officer Alarcon did testify that he believed Public Law 280 authorized his detention of Astorga until state officials arrived. Public Law 280 only applies to the Ysleta Pueblo indirectly through the Restoration Act, which in turn gives *state officials* criminal jurisdiction over state law violations committed on the Pueblo. Public Law 280 does not address the question of a tribal officers' authority to assist local officials in investigating state law violations. Officer Alarcon also testified that he believed his detention of Astorga was authorized by the Bureau of Indian Affairs (BIA) and his "SLEC" card. Under the Indian Law Enforcement Reform Act (ILERA), the BIA may delegate the responsibility for enforcing federal law to tribal police through a contract with the tribe, and once in place, the BIA issues special law enforcement commissions (or SLEC) cards to the tribal officers qualified to carry out that task. Although it appears that Officer Alarcon held an SLEC card through the BIA, it does not appear that this authorized him to investigate state law violations. While the ILERA allows BIA

Because the tribal officers lacked the authority to arrest Astorga, and because their actions went beyond their inherent "policing authority" as contemplated by *Cooley*, we conclude that the trial court did not err in finding Astorga's detention to be unlawful.[11] Accordingly, we overrule the State's Issue One.

## VI. THE STRIP SEARCH AND THE FRUITS OF THE POISONOUS TREE

In Issue Two, the State contends that the searches that took place at the tribal police headquarters were reasonable and justified under the Fourth Amendment and state law. In particular, the State contends that police may always engage in a "stationhouse search" that is part of the "normal booking procedure." *See Illinois v. Lafayette*, 462 U.S. 640, 643-48 (1983) (police may conduct a search of an "arrestee's" person and possessions at the station, for various reasons, including the safety of the officers and others at the station, as well as the arrestee himself). As for the strip search, the State relies on *Gilmore v. State*, 323 S.W.3d 250, 256 (Tex.App.--Texarkana 2010, pet. ref'd), in which our sister court held that a search of an arrestee was reasonable where the officers had received an anonymous tip that the arrestee was concealing narcotics on his person, which in turn justified the search based on the "significant and legitimate security interests" of keeping contraband out of penal institutions. But this line of authority is premised on a legal arrest that caused the detainee to be in the jail in the first place. *See Lafayette*, 462 U.S. at 643-48 (contemplating that the defendant must be *lawfully* arrested before such a

---

"employees" to assist state agencies, upon request, with enforcement of state laws on Indian reservations, it does not appear that Officer Alarcon was a BIA employee, or that the State made a request for the BIA's assistance in this case. 28 U.S.C. § 2803(8).

[11] We note that that no claim is made here that Astorga needed to be handcuffed or restrained because he posed a safety or flight risk, nor that Astorga needed to be transported from the location of the traffic stop due to other safety considerations.

search may in fact take place); *Gilmore*, 323 S.W.3d at 256 (characterizing the search as being incident to the arrest, which authorizes "a full search of the person.").

Thus, we can set aside the questions of whether the tribal police were justified in conducting the strip search (as opposed to contacting the EPPD and awaiting their arrival). Because if the arrest or detention following the conclusion of the traffic stop was improper, the evidence garnered at the tribal police headquarters is tainted and must be excluded. When, as here, a defendant is found to be in custody as the result of an illegal arrest or detention, both the Fourth Amendment and state law require evidence found as the result of the illegal arrest to be excluded. *See Johnson v. State*, 878 S.W.2d 164, 168-69 (Tex.Crim.App. 1994) (en banc) (under the exclusionary rule of the Fourth Amendment, evidence which is obtained as the result of an illegal arrest may be suppressed by a defendant), *citing Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *see also* TEX.CODE CRIM.PROC.ANN. ART. 38.23(a) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case."). The federal exclusionary rule and article 38.23 of the Code of Criminal Procedure extend to evidence found as both the direct and indirect result of an illegal arrest, search, or seizure, known as the "fruit of the poisonous tree." *See Wong Sun*, 371 U.S. at 485-86; *Smith v. State*, 542 S.W.2d 420, 422 (Tex.Crim.App. 1976); *see also State v. Iduarte*, 268 S.W.3d 544, 550 (Tex.Crim.App. 2008) (all evidence obtained as a direct or indirect result of an unlawful arrest must be suppressed under the "fruit of the poisonous tree" doctrine.).

The primary purpose of the exclusionary rule is to deter unlawful police conduct by precluding the use of illegally obtained evidence. *See United States v. Calandra*, 414 U.S. 338, 347-48 (1974). Accordingly, in determining whether evidence can be classified as a "fruit

21

requiring exclusion," the question is not whether the evidence would have been discovered "but for" the primary violation, but whether "granting establishment of the primary illegality," the evidence was discovered due to the "exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Iduarte*, 268 S.W.3d at 550-51 (internal quotation marks omitted). Here, the trial court correctly determined that the methamphetamine was found as the direct result of Astorga's illegal arrest and detention at the tribal police headquarters, and therefore resulted from an "exploitation" of the illegal detention.

Accordingly, we conclude that the trial court properly held that the evidence discovered during that search was unlawfully obtained should be suppressed. The State's Issue Two is overruled.

## VII. CONCLUSION

Because we conclude that the State has failed to meet its burden to show that the tribal officers' detention that led to the discovery of the contraband was reasonable under the circumstances, we affirm the trial court's order granting Astorga's motion to suppress the evidence obtained as the result of that search.

JEFF ALLEY, Justice

October 27, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Publish)

22