CITY OF TULSA v. O'BRIEN
2024 OK CR 31
Case Number: S-2023-715
Decided: 12/05/2024
CITY OF TULSA, Appellant v. NICHOLAS RYAN O'BRIEN, Appellee
Cite as: 2024 OK CR 31, __ __

 

 

O P I N I O N

HUDSON, JUDGE:

¶1 Appellee, Nicholas Ryan O'Brien, was charged by Information in the Municipal Criminal Court of the City of Tulsa with the following misdemeanor traffic crimes:

Case No. 720766, Driving Under the Influence of Alcohol, in violation of City of Tulsa Revised Ordinances Title 37, § 649;

Case No. 720766A, Transporting an Open Container, in violation of City of Tulsa Revised Ordinances Title 37, § 657;

Case No. 720766B, Operating a Motor Vehicle With an Expired Tag, in violation of City of Tulsa Revised Ordinances Title 37, § 409;

Case No. 720766C, Driving Left of Center, in violation of City of Tulsa Revised Ordinances Title 37, § 637; and

Case No. 720766D, Improper Use of Left Lane, in violation of City of Tulsa Revised Ordinances Title 37, § 640.

¶2 The Information alleged these offenses occurred on August 30, 2021, while O'Brien was driving a motor vehicle on a multi-lane public street, at or near 1300 South Denver Avenue, in the city of Tulsa. This traffic stop was conducted by the Tulsa Police Department.

¶3 On October 6, 2022, O'Brien through counsel filed a motion to dismiss alleging that the City lacked jurisdiction over his case pursuant to McGirt v. Oklahoma, 591 U.S. 894 (2020) because he was an enrolled citizen of the federally recognized Osage Nation tribe and the alleged crimes occurred within the boundaries of the Muscogee (Creek) Nation. In McGirt, the Supreme Court held that the Creek Reservation in eastern Oklahoma was never disestablished by Congress and, thus, constitutes Indian Country for purposes of federal criminal jurisdiction. Id. at 913, 932. The Honorable Mitchell M. McCune, Municipal Judge, denied the motion on January 13, 2023, finding the City had jurisdiction over the case. In his written order, Judge McCune cited a federal district court decision agreeing with Tulsa that Congress granted the city jurisdiction over municipal violations by all its inhabitants, including Indians, through Section 14 of the Curtis Act, 30 Stat. 495 (1898). See Hooper v. City of Tulsa, 2022 WL 1105674 (N.D. Okla. Apr. 13, 2022).

¶4 On June 28, 2023, O'Brien's counsel filed a second motion to dismiss for lack of jurisdiction, this time based on the Tenth Circuit's reversal in Hooper. In that decision, the Tenth Circuit held that Section 14 of the Curtis Act no longer grants Tulsa jurisdiction over municipal violations committed by Indians. Hooper v. City of Tulsa, 71 F.4th 1270, 1288 (10th Cir. 2023). Tulsa filed a responsive pleading opposing O'Brien's motion to dismiss. Tulsa maintained its previous arguments based on the Curtis Act. In the alternative, the City argued that the State of Oklahoma retained concurrent jurisdiction with the Tribes over criminal offenses committed by Indians on the reservation, and thus Tulsa also had concurrent jurisdiction over Indian offenses as delegated by the State.

¶5 Tulsa cited Oklahoma v. Castro-Huerta, 597 U.S. 629 (2022) to support its claim that there is no federal statute granting exclusive jurisdiction to the Tribes or federal government over non-major crimes committed by Indians in Indian country. Tulsa invoked the balancing test from White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142-43 and argued that the balance of tribal interests, federal interests and state interests does not bar the State, and therefore the City, from prosecuting O'Brien's crimes in its courts. Tulsa specifically argued that the exercise of concurrent State-delegated jurisdiction in O'Brien's case does not unlawfully infringe on tribal self-government. See Castro-Huerta, 597 U.S. at 649-51.

¶6 On August 14, 2023, Judge McCune conducted a telephonic conference with counsel for both parties and advised the parties, for the first time, that he was dismissing O'Brien's case for lack of subject matter jurisdiction. The Court advised that a written order would follow. Counsel for the City of Tulsa at that time advised that the City would be appealing the court's decision as a reserved question of law concerning subject matter jurisdiction. On August 17, 2023, Judge McCune granted O'Brien's motion to dismiss in a written order. Judge McCune found that the Tenth Circuit's decision in Hooper undermined the City's arguments based on the Curtis Act and that it "must follow the law that is in place at this time." Judge McCune also rejected Tulsa's alternative argument based on Castro-Huerta as follows:

The City of Tulsa asserts that Oklahoma v. Castro-Huerta . . . confers concurrent jurisdiction to the City for violations of ordinances in the City of Tulsa. However, the Castro-Huerta ruling is specifically limited to concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian Country. No mention is made as to concurrent jurisdiction when the defendant is Indian. Nor, does there appear to be any discussion in Castro-Huerta that the General Crimes Act, 18 U.S.C. § 1152 (1948), confers concurrent jurisdiction over defendants who are Indian.

Order at 3.

¶7 The City of Tulsa now appeals this ruling pursuant to 22 O.S.2021, § 1053

I. MOTION TO DISMISS APPEAL

¶8 O'Brien has filed a motion to dismiss the City's appeal for lack of jurisdiction. First, O'Brien argues the City failed to give notice in open court of its intent to appeal as required by Rule 2.1(D), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2024). O'Brien is incorrect. The record shows that Tulsa's counsel gave notice of its intent to appeal during the August 14, 2023, teleconference in which Judge McCune announced, for the first time, that he would be granting O'Brien's motion to dismiss. O'Brien complains that giving notice of intent to appeal to the Court over the phone, during a teleconference, is insufficient to satisfy Rule 2.1(D). We reject this claim and find the City's announcement was sufficient under the circumstances presented here to provide the requisite notice to Judge McCune, his clerk, and O'Brien's counsel when the court announced its oral ruling.

¶9 Second, O'Brien claims that Judge McCune did not enter a final appealable order necessary to support this appeal. This claim too lacks merit. Judge McCune entered an order dismissing the municipal prosecution of O'Brien's alleged crimes for lack of subject matter jurisdiction. With this ruling, O'Brien's prosecution came to an end and the case was dismissed with no potential to refile the case in municipal court. On this record, Judge McCune's dismissal order was a final appealable order from which the City of Tulsa could appeal under Section 1053. Under our case law, jurisdiction for this appeal is appropriate as an appeal from a decision quashing the Information. 22 O.S.Supp.2022, § 1053See State v. Ward, 2022 OK CR 16516 P.3d 261State v. Klindt, 1989 OK CR 75782 P.2d 401

¶10 We further find this appeal is authorized under the plain language of Section 1053(7), which authorizes a state or municipal appeal "[u]pon an order, decision or judgment finding that a defendant is immune from or not subject to criminal prosecution." 22 O.S.Supp.2022, § 1053DENIED.

II. STANDARD OF REVIEW

¶11 We generally review the lower court's decision in a state appeal for abuse of discretion. The City's challenge to Judge McCune's jurisdictional ruling, however, rests primarily on a series of legal questions relating to federal preemption we review de novo. See State v. Allen, 2021 OK CR 14492 P.3d 27

III. DEO V. PARISH

¶12 In its first proposition, Tulsa contends that Judge McCune erred in dismissing O'Brien's case for subject matter jurisdiction. Tulsa cites our recent decision in Deo v. Parish, 2023 OK CR 20541 P.3d 833Deo, 2023 OK CR 20Deo is distinguishable from the present case because, in pertinent part, Appellee filed his formal challenge based on McGirt to the trial court's jurisdiction in a timely manner, before the first actual hearing in the case. There is thus no waiver by O'Brien of his Indian country jurisdictional claim, and no basis for relief under Deo, despite the lower court's reference to subject matter jurisdiction. See Deo, 2023 OK CR 20

IV. PREEMPTION OF STATE JURISDICTION

¶13 In its second proposition, Tulsa argues that it has criminal jurisdiction in this case derived from the State's jurisdiction and, thus, Tulsa has concurrent jurisdiction with the Tribe over municipal offenses committed by Indians within the Tulsa city limits. Under the Constitution, States have the authority to prosecute crimes committed within their territory "except when preempted (in a manner consistent with the Constitution) by federal law or by principles of tribal self-government." Oklahoma v. Castro-Huerta, 597 U.S. 629, 652-53 (2022). For the reasons discussed below, we find that the City of Tulsa's criminal jurisdiction to prosecute O'Brien for DUI, and the other related traffic offenses in this case, was not preempted under federal law or by principles of tribal self-government.

A. State Jurisdiction in Indian Country

¶14 In Castro-Huerta, the Supreme Court recognized that "the Constitution allows a State to exercise jurisdiction in Indian country [and] Indian country is part of the State, not separate from the State." 597 U.S. at 636. Indian reservations are no longer viewed as "distinct nations" like in the past. Id. (citing Organized Village of Kake v. Egan, 369 U.S. 60, 72 (1962)). Unless preempted by federal law, "as a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country." Id. (citing U.S. Const. amend. X). This rule is based on the proposition that "a State is generally 'entitled to the sovereignty and jurisdiction over all the territory within her limits.'" Id. (quoting Lessee of Pollard v. Hagan, 3 How. 212, 228, 11 L. Ed. 565 (1845)). The Supreme Court recognized in Castro-Huerta that, "[s]ince the latter half of the 1800s, the Court has consistently and explicitly held that Indian reservations are 'part of the surrounding State' and subject to the State's jurisdiction 'except as forbidden by federal law.'" Id. (quoting Egan, 369 U.S. at 72). 

B. Tribal Sovereignty 

¶15 "Due to their incorporation into the United States . . . the 'sovereignty that the Indian tribes retain is of a unique and limited character.'" United States v. Cooley, 593 U.S. 345, 349-50 (2021) (quoting United States v. Wheeler, 435 U.S. 313, 323 (1978)). Indian tribes are "distinct, independent political communities[.]" Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 327 (2008) (quoting Worchester v. Georgia, 6 Pet. 515, 559, 8 L. Ed 483 (1832)). Tribes retain inherent sovereign authority over both their members and their territories. Ysleta Del Sur Pueblo v. Texas, 596 U.S. 685, 689 (2022). Tribal jurisdiction, however, is subject to the overarching control of Congress. Haaland v. Brackeen, 599 U.S. 255, 272 (2023) ("In a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as 'plenary and exclusive.'" (quoting United States v. Lara, 541 U.S. 193, 200 (2004))).

¶16 "Indian reservations are 'a part of the territory of the United States' and they 'hold and occupy [the reservations] with the assent of the United States, and under their authority.'" Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 208-09 (1978) (quoting United States v. Rogers, 4 How, 567, 571, 572, 11 L. Ed. 2d 1105 (1846)). Tribes nonetheless have the inherent power to regulate their own members and internal affairs through tribal self-government. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142 (1980). This includes the inherent authority "to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions." Wheeler, 435 U.S. at 322. See Montana v. United States, 450 U.S. 544, 564 (1981).

C. Preemption of State Jurisdiction

¶17 Under the Supreme Court's precedent, "a State's jurisdiction in Indian country may be preempted (i) by federal law under ordinary principles of federal preemption, or (ii) when the exercise of state jurisdiction would unlawfully infringe on tribal self-government." Castro-Huerta, 597 U.S. at 638.

1. General Crimes Act

¶18 O'Brien's crimes are general crimes for purposes of federal Indian law. 18 U.S.C. § 1152.Castro-Huerta, 597 U.S. at 640. However, nothing in the plain language of the General Crimes Act preempts the State's authority to prosecute crimes in Indian country. Castro-Huerta, 597 U.S. at 639-40 and n.2. As the Supreme Court held in Castro-Huerta, "the General Crimes Act does not treat Indian country as the equivalent of a federal enclave for jurisdictional purposes. Nor does the Act make federal jurisdiction exclusive or preempt state law in Indian country." Id. at 642. Thus, "[u]nder the General Crimes Act . . . both the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed in Indian country." Id. at 639 (footnote omitted).

¶19 O'Brien and amicus, the Muscogee (Creek) Nation tribe, both contend that Castro-Huerta does not apply here because that decision was limited to deciding whether the State had concurrent jurisdiction with the federal government to prosecute a non-Indian for a reservation crime against an Indian victim. To the contrary, the Supreme Court's discussion in Castro-Huerta about the ways in which a state's criminal jurisdiction over Indians may be preempted was not limited to criminal cases involving non-Indian defendants and Indian victims. The same is true of the Court's interpretation in Castro-Huerta of the plain language of the General Crimes Act, which cannot logically be read to preempt state jurisdiction over Indian defendants, while not preempting state jurisdiction over Indian victims. In Castro-Huerta, the Court observed that:

[t]o the extent that a State lacks prosecutorial authority over crimes committed by Indians in Indian country (a question not before us), that would not be a result of the General Crimes Act. Instead, it would be the result of a separate principle of federal law that . . . precludes state interference with tribal self-government.

Castro-Huerta, 597 U.S. at 639 n.2 (citing Bracker, 448 U.S. at 142-43 and McClanahan v. Arizona Tax Comm'n, 411 U.S. 164, 171-72 (1973)).

2. Public Law 280/Oklahoma Enabling Act

¶20 O'Brien contends that Public Law 280 and the 1906 Oklahoma Enabling Act preempt state, and thus municipal, jurisdiction over his crimes. Castro-Huerta, however, held that "Public Law 280 does not preempt any preexisting or otherwise lawfully assumed jurisdiction that States possess to prosecute crimes in Indian country" and that "Public Law 280 contains no language that preempts States' civil or criminal jurisdiction." Castro-Huerta, 597 U.S. at 647-48. To the extent O'Brien relies upon the 1906 Oklahoma Enabling Act to show preemption, his argument must similarly fail. In Castro-Huerta, the Supreme Court held that statutory language in the Oklahoma Enabling Act reserving jurisdiction and control to the United States did not divest Oklahoma of criminal jurisdiction over its own territory. Rather, such language was "meant to preserve federal jurisdiction to the extent that it existed before statehood, not to make federal jurisdiction exclusive." Id. at 653-55. Appellee's claim that the language in Article 1, § 3, of the Oklahoma Constitution preempts Tulsa's jurisdiction in this case, fails for similar reasons. See Purdom v. State, 2022 OK CR 31

3. Indian Civil Rights Act

¶21 O'Brien's reliance upon Congress's amendment to the Indian Civil Rights Act recognizing "the inherent power of Indian tribes . . . to exercise criminal jurisdiction over all Indians[,]" 25 U.S.C. § 1301(2), does not undermine the State's or the City's jurisdiction in this case. This amendment occurred after the Supreme Court's decision in Duro v. Reina, 495 U.S. 676 (1990) holding that the retained sovereignty of a tribe to govern its own affairs does not include the authority to prosecute a nonmember Indian for crimes committed on its reservation. Id. at 679. The Supreme Court subsequently recognized this amendment does not interfere with the power or authority of any State. United States v. Lara, 541 U.S. 193, 205 (2004). Nor does the plain language of Section 1301 make an Indian tribe's prosecution authority over nonmember Indians exclusive.

4. Tenth Amendment

¶22 The Tribe argues that state laws are generally not applicable to tribal Indians on an Indian reservation except where Congress has explicitly provided state laws apply. The Tribe argues that the Tenth Amendment

¶23 The Tribe's argument lacks merit. "Under our Federal system, the State possesses primary authority for defining and enforcing the criminal law." United States v. Lopez, 514 U.S. 549, 561 n.3 (1995) (internal quotation omitted). See Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." (internal quotation omitted)). Oklahoma's authority to exercise its sovereign criminal jurisdiction over all its territory, including Indian country, extends from the doctrine "that new States are admitted to the Union on an 'equal footing' with existing States." Herrera v. Wyoming, 587 U.S. 329, 338 (2019) (internal quotation omitted). Cf. Castro-Huerta, 597 U.S. at 636 ("a State is generally 'entitled to the sovereignty and jurisdiction over all the territory within her limits.'" (quoting Lessee of Pollard, 3 How. at 228)).

¶24 The relationship between the state's sovereign authority to exercise jurisdiction over all persons and things within its own territory, and Congress's constitutional authority over the Indian tribes, has been described by the Supreme Court as resting on "fundamental principles . . . of equal dignity, and neither must be enforced as to nullify or substantially impair the other." Dick v. United States, 208 U.S. 340, 353 (1908). Upon its admission to the Union, a State is on equal footing with every other State that has come before it. Id. The Constitution envisions "an indestructible Union, composed of indestructible States." Gregory v. Ashcroft, 501 U.S. 452, 457 (1991) (quoting Texas v. White, 7 Wall. 700, 725, 19 L. Ed. 227 (1869)). As part of its sovereign power, the State has "full and complete jurisdiction over all persons and things within its limits, except as it may be restrained by the provisions of the Federal Constitution or by its own Constitution." Dick, 208 U.S. at 353. Congress's authority to regulate commerce with tribal governments derives from the express language of the Constitution and is deserving of equal respect in the State's exercise of its traditional police powers. Id. See U.S. Const. art. I, § 8. cl. 3.

¶25 On this point, the Supreme Court observed:

In regulating commerce with Indian tribes Congress must have regard to the general authority which the state has over all persons and things within its jurisdiction. So, the authority of the state cannot be so exerted as to impair the power of Congress to regulate commerce with the Indian tribes.

Dick, 208 U.S. at 353.

5. Supreme Court Case Law (Criminal)

¶26 The State's criminal jurisdiction over its own territory and all the people on it have long been recognized as part of its reserved powers under the Constitution. O'Brien and the Tribe cite passages from Supreme Court decisions addressing federal criminal jurisdiction under the Major Crimes Act for the proposition that state courts "generally have no jurisdiction to try Indians for conduct committed in 'Indian country.'" McGirt, 591 U.S. at 898 (emphasis added).See also Negonsott v. Samuels, 507 U.S. 99, 102-03 (1993); United States v. Antelope, 430 U.S. 641, 642 n.1 (1977). These cases, however, do not interpret the General Crimes Act, let alone the issue before this Court--viz., whether state jurisdiction over misdemeanor traffic crimes committed by a non-member Indian on the reservation is preempted--and are thus distinguishable from the present case. Indeed, the quote from McGirt by its own terms sets forth a general rule, not a per se rule against criminal jurisdiction of any kind.

 

 

6. Supreme Court Case Law (Civil)

 

¶27 O'Brien and the Tribe also invoke decisions in civil cases like Michigan v. Bay Mills Indian Cmty., 572 U.S. 782 (2014) and McClanahan 411 U.S. 164 (1973) for the broader proposition that "[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply." McClanahan, 411 U.S. at 170-71. The Supreme Court's case law, however, does not hold that state criminal jurisdiction which deals in any way with Indians on the reservation is per se preempted by the Indian Commerce Clause, the Treaty Clause or the trust relationship between the United States and the Tribes which informs Congress's exercise of its legislative powers. See Brackeen, 599 U.S. at 274-75 (addressing constitutional sources of power for Congress's plenary and exclusive authority to legislate with respect to Indians). Castro-Huerta itself dispelled this assertion with its holding that Oklahoma has concurrent jurisdiction in Indian country where non-Indian defendants perpetrate general crimes against Indian victims. "[E]ven on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148 (1973).

7. Limited Tribal Sovereignty

¶28 The question in Indian country is whether the State's criminal jurisdiction over an Indian reservation that is part of its territory is preempted by federal law. See Castro-Huerta, 597 U.S. at 636 (citing U.S. Const. amend. X). The Tribe's argument ignores the Supreme Court's recognition, based on its prior decisions dating back to the 1800s, that Indian reservations are no longer viewed as distinct nations occupying their own territory like in the past and "States have jurisdiction to prosecute crimes committed in Indian country unless preempted." Castro-Huerta, 597 U.S. at 637. The Supreme Court has recognized that "our recent cases have established a 'trend . . . away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption.'" Rice v. Rehner, 463 U.S. 713, 718 (1983) (quoting McClanahan, 411 U.S. at 172 (footnote omitted)). "The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power." McClanahan, 411 U.S. at 172. The doctrine of Indian sovereignty, premised on the rule that state laws generally are inapplicable on the reservation except where Congress has expressly provided that state law may apply, "has not been rigidly applied in cases where Indians have left the reservation and become assimilated into the general community." Id. at 171 (citing Oklahoma Tax Comm'n v. United States, 319 U.S. 598 (1943)).

¶29 Congress's plenary and exclusive authority under the Constitution to legislate in the field of criminal law on the reservation is not in dispute. See Brackeen, 599 U.S. at 272-278. Congress's broad Indian affairs power, however, "is not absolute[,]" id. at 276 (internal quotation omitted), and does not undermine the States' authority as part of its broad police powers to assert criminal jurisdiction over all its territory, including that portion with Indian reservations unless explicitly prohibited by Congress. That Congress has the power to displace the Indian country criminal jurisdiction of State courts does not mean that it has done so. Cf. Brackeen, 599 U.S. at 277 ("when Congress validly legislates pursuant to its Article I powers, we have not hesitated to find conflicting state family law preempted, [n]otwithstanding the limited application of federal law in the field of domestic relations generally.") (internal quotation omitted). Applying ordinary rules of preemption, Congress's failure to exercise its authority to preempt State criminal jurisdiction in Indian country does not thwart the State's exercise of its traditional police powers over Indian country within its own boundaries.

8. Summary

¶30 To summarize, "the text of the General Crimes Act . . . does not make federal jurisdiction exclusive or preempt state jurisdiction." Castro-Huerta, 597 U.S. at 644. "Public Law 280 contains no language that preempts States' civil or criminal jurisdiction." Castro-Huerta, 597 U.S. at 648. "[U]nder the Constitution and [the Supreme Court's] precedents, the default is that States may exercise criminal jurisdiction within their territory. States do not need a permission slip from Congress to exercise their sovereign authority . . . the default is that States have criminal jurisdiction in Indian country unless that jurisdiction is preempted." Id. at 653. O'Brien's and the Tribe's view that the State may only act if Congress specifically provides for it "is inconsistent with the Constitution's structure, the States' inherent sovereignty, and the [Supreme] Court's precedents." Id. We therefore reject O'Brien's and the Tribe's claim that Oklahoma's criminal jurisdiction, and thus the City of Tulsa's criminal jurisdiction, is preempted because Congress has not expressly authorized it.

V. CRIMINAL BRACKER BALANCING

¶31 We now address whether the State's (and thus the City's) exercise of criminal jurisdiction in this case is preempted by principles of tribal self-government.See Castro-Huerta, 597 U.S. at 650-52. As in Bracker, this requires a balancing of the federal, state and tribal interests. Bracker, 448 U.S. at 145. Here, principles of tribal self-government do not bar Tulsa from prosecuting misdemeanor traffic crimes committed by non-member Indians on the Muscogee (Creek) reservation when those offenses occur on public roads and streets in the city of Tulsa.

¶32 First, the exercise of state (and municipal) jurisdiction under these circumstances would not infringe on tribal self-government.

¶33 Second, Tulsa's prosecution of non-member Indians for misdemeanor traffic crimes also would not harm the federal interest in protecting Indians on the Creek reservation. Federal jurisdiction over such crimes would be concurrent to the city's jurisdiction and thus not affected. See 18 U.S.C. §§ 13, 1152. The federal interest in public safety on the reservation for all citizens would be enhanced by Tulsa's assertion of jurisdiction over non-member Indians for these crimes. That is especially so considering Tulsa already has primary responsibility for law enforcement within its own city limits and the limited role of the federal government in prosecuting misdemeanor traffic offenses.

¶34 Third, the State of Oklahoma (like Tulsa) has a strong sovereign interest in ensuring public safety on the roads and highways of its territory and in ensuring criminal justice for all citizens--Indian and non-Indian. Tulsa already has primary responsibility for enforcement of the laws within its city limits, particularly misdemeanor traffic offenses. Tulsa's prosecution of non-Creeks for these crimes on the reservation, as part of its concurrent jurisdiction, would enhance the interests of both the State and city in protecting the motoring public, potentially reducing motor vehicle accidents and deaths across its territory, regardless of tribal identity.

¶35 We find the balance of interests under Bracker does not preempt the exercise of state (and thus municipal) jurisdiction in the present case. Tulsa's exercise of jurisdiction in this case would not unlawfully infringe upon tribal self-government. We therefore find that the City of Tulsa has concurrent jurisdiction to proceed with the prosecution of this case and the lower court's order dismissing this case for lack of subject matter jurisdiction must be reversed. Proposition II is granted.

VI. THE CURTIS ACT 

¶36 In its third proposition, Tulsa claims jurisdiction in this case based on the Curtis Act of 1898 (Act of June 28, 1898, ch. 517, § 14, 30 Stat. 495, 499-500). We reject Tulsa's arguments on this point. The parties in Hooper made virtually the same arguments before the Tenth Circuit regarding Section 14 of the Curtis Act and whether it provides Tulsa with criminal jurisdiction over Indian defendants. See Hooper, 71 F.4th at 1273. The Tenth Circuit ruled that the powers Tulsa possessed pursuant to Section 14 of the Curtis Act were lost 1) upon statehood, and 2) when Tulsa incorporated under the laws of the State of Oklahoma. The Tenth Circuit rejected Tulsa's arguments that Section 14 of the Curtis Act grants Tulsa jurisdiction. Id. at 1286-87.

¶37 While this Court is not bound by the Tenth Circuit's resolution of this issue, we nonetheless follow the Tenth Circuit's guidance until the United States Supreme Court rules on the issue. See McCauley v. State, 2024 OK CR 8548 P.3d 461Davis v. State, 2011 OK CR 29Hooper addressed virtually the same issues raised by Tulsa in this case. Further, the analysis in the Tenth Circuit's opinion establishes that Tulsa's Curtis Act arguments are without merit. Proposition III is denied.

DECISION

¶38 Appellee's motion to dismiss this appeal for lack of jurisdiction is DENIED. The Order of the Municipal Criminal Court of the City of Tulsa dismissing this case is REVERSED AND REMANDED for reinstatement of the case and further proceedings not inconsistent with this Opinion. Appellee's motion to strike the City of Tulsa's reply brief is DENIED. The Muscogee (Creek) Nation's request for Oral Argument is DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2024), the MANDATE is ORDERED issued upon delivery and filing of this decision.

AN APPEAL FROM THE MUNICIPAL CRIMINAL COURT
OF THE CITY OF TULSA 
THE HONORABLE MITCHELL M. MCCUNE, MUNICIPAL JUDGE

 

 
 
 
 APPEARANCES AT TRIAL

 BRETT CHAPMAN
 ATTORNEY AT LAW
 15 WEST SIXTH ST.
 SUITE NO. 2800
 TULSA, OK 74104
 COUNSEL FOR DEFENDANT
 
 
 APPEARANCES ON APPEAL

 BECKY JOHNSON
 SR. ASST. CITY ATTORNEY
 CITY OF TULSA LEGAL DEPT.
 175 E. 2ND ST., SUITE 685
 TULSA, OK 74103
 COUNSEL FOR APPELLANT
 
 
 
 
 BECKY JOHNSON
 SR. ASST. CITY ATTORNEY
 CITY OF TULSA LEGAL DEPT.
 175 E. 2ND ST., SUITE 685
 TULSA, OK 74103
 COUNSEL FOR THE CITY
 
 
 BRETT CHAPMAN
 ATTORNEY AT LAW
 15 WEST SIXTH ST.
 SUITE NO. 2800
 TULSA, OK 74104
 COUNSEL FOR APPELLEE

 GERALDINE WISNER
 ATTORNEY GENERAL
 MUSCOGEE (CREEK) NATION
 P.O. BOX 580
 OKMULGEE, OK 74447
 COUNSEL FOR AMICUS
 MUSCOGEE (CREEK) NATION

 STEPHANIE R. RUSH
 KANJI & KATZEN, P.L.L.C.
 P.O. BOX 2579
 SAPULPA, OK 74067
 COUNSEL FOR AMICUS
 MUSCOGEE (CREEK) NATION

 RIYAZ A. KANJII
 DAVID A. GIAMPETRONI
 PHILIP H. TINKER
 KANJI & KATZEN, P.L.L.C.
 P.O. BOX 3971
 ANN ARBOR, MI 48106
 COUNSEL FOR AMICUS
 MUSCOGEE (CREEK) NATION
 
 
 

 

OPINION BY: HUDSON, J.
ROWLAND, P.J.: CONCUR
MUSSEMAN, V.P.J.: SPECIALLY CONCUR
LUMPKIN, J.: SPECIALLY CONCUR
LEWIS, J.: CONCUR IN PART/DISSENT IN PART

FOOTNOTES

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

McGirt for the proposition that the Supreme Court "has long 'require[d] a clear expression of the intention of Congress' before the state or federal government may try Indians for conduct on their lands[.]" McGirt, 591 U.S. at 929 (quoting Ex parte Crow Dog, 109 U.S. 556, 572 (1883)). That passage of the opinion focused on territorial criminal jurisdiction in Oklahoma prior to statehood, and invoked the earlier view from Worchester v. Georgia, 6 Pet. 515, 557, 8 L. Ed. 483 (1832) that Indian tribes were viewed as distinct communities occupying their own territories and subject to no state authority. McGirt, 591 U.S. at 928-29. This portion of McGirt, however, was undermined by Castro-Huerta which held that the views expressed in Worchester "yielded to closer analysis" and, since the late 1800s, Indian reservations are now considered part of the surrounding state and subject to state jurisdiction except as forbidden by federal law. Castro-Huerta, 597 U.S. at 636-37.

Hagen v. Utah, 510 U.S. 399, 401-02 (1994) which held that the Uintah Reservation had been diminished by Congress and the town of Myton, Utah, where the Indian petitioner committed a state narcotics offense, was not Indian country and was subject to state jurisdiction. Id. at 401-02, 421-22. This case too did not interpret the General Crimes Act and does not control the decision in this case.

Bracker analysis. Instead, the Tribe argues that federal law prohibits judicial balancing in this case because the defendant is Indian and alternatively, that Bracker balancing is impractical in the context of criminal jurisdiction and only properly exercised by Congress. We reject these claims for the reasons discussed earlier.

 

 

MUSSEMAN, V.P.J., SPECIALLY CONCURRING:

¶1 While my analysis and ultimate holding is not foreclosed by the Court's Opinion today, it is not clear that it necessarily embraces my reasoning in reaching its narrower conclusion. As a result, I write separately to both rebut the dissent's assertion that Castro-Huerta

As a result of Bracker

¶2 In this Court's first criminal Bracker balancing, it is my goal to provide sufficient analytical framework to assist district courts in deploying this balancing test as these issues arise. Because of the Court's narrow holding and limited analysis today, it is my belief that unique permutations will emerge from district courts across Oklahoma with disparate results for communities.

¶3 However, I first want to emphasize the narrow extent in which I diverge from the Court regarding preemption of State jurisdiction in Indian country over Indian defendants. I fully join the Court's foundational holding:

One, there are two forms of preemption that we must address in Indian country:
(i) by federal law under ordinary principles of federal preemption, and
(ii) when the exercise of State jurisdiction would unlawfully infringe on tribal self-government.

Castro-Huerta, 597 U.S. at 638.

Two, there is no traditional preemption of State jurisdiction over an Indian committing a non-major crime in Indian country. Id. at 639 n.2, 641-42.

Three, the Court must then apply Bracker balancing to determine if State jurisdiction would unlawfully infringe on tribal self-government. Id. at 639 n.2, 649.

¶4 Additionally, I join in full the unanimous resolution regarding the sufficiency of the State's notice, the nature of the trial court's order, the timeliness of the State's appeal, and the City's Curtis Act argument.

I.

¶5 Turning first to the dissent, it rejects entirely the Court's foundational analysis regarding preemption before even considering Bracker balancing. Instead, the dissent retorts that the State requires express permission from Congress to exercise criminal jurisdiction over any Indian in Indian country. Contra Castro-Huerta, 597 U.S. at 653 ("States do not need a permission slip from Congress to exercise their sovereign authority. . . . [T]he default is that States have criminal jurisdiction in Indian country unless that jurisdiction is preempted.") (emphasis in original). To do so, the dissent must disregard the plain holding of Castro-Huerta and instead rely largely on Justice Gorsuch's dissent and a string of citations to U.S. Supreme Court precedent that ultimately undermine its own argument.

¶6 The dissent would ignore the questions of ordinary federal preemption and judicial preemption under Bracker set out in Castro-Huerta and would instead follow Justice Gorsuch's dissent that States lack jurisdiction over Indians in Indian country. However, "[c]omments in the dissenting opinion suggesting anything otherwise 'are just that: comments in a dissenting opinion.'" Id. at 656 (quoting Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 177, n. 10 (1980)). The U.S. Supreme Court plainly set out its holding to the contrary in Castro-Huerta:

To be clear, the Court today holds that Indian country within a State's territory is part of a State, not separate from a State. Therefore, a State has jurisdiction to prosecute crimes committed in Indian country unless state jurisdiction is preempted.

Id. at 655. It is this holding that the Court is bound by and employs today.

¶7 Similarly, the dissent's string of U.S. Supreme Court precedent provides little to no support while three serve to reinforce a strong jurisdictional distinction between member and non-member Indians--a salient point in the Court's analysis, and a critical one in my own. Fisher is a child adoption case concerning a member Indian in Indian country in which the U.S. Supreme Court held that the tribal court had jurisdiction to the exclusion of State courts. Fisher v. District Court, 424 U.S. 382, 387, 389 (1976). DeCoteau is an Indian country case deciding whether the Lake Traverse Indian Reservation in South Dakota was disestablished, but notably also concerned member Indians. DeCoteau v. District County Court, 420 U.S. 425, 426-27 (1975). In McClanahan, the U.S. Supreme Court found the State lacked the authority to tax member Indians living and working within Indian country. McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 165, 172, 181 (1973) ("The question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.") (emphasis added).

¶8 Each of these cases exemplify the importance of member versus non-member Indian status when deciding preemption of State jurisdiction. This is not only illustrated by the U.S. Supreme Court's application of McClanahan in Washington v. Confederated Tribes of Colville Indian Reservation, it is highlighted as the deciding point. The U.S. Supreme Court held "[n]or would the imposition of [the State's] tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation." Washington v. Confederated Tribes of Colville Indian Rsrv., 447 U.S. 134, 161 (1980).

¶9 The remaining three U.S. Supreme Court cases cited by the dissent are largely irrelevant to State jurisdiction over Indians. Williams concerned tribal jurisdiction over a non-Indian who was required by the Commissioner of Indian Affairs to be licensed to do business with the tribe on the reservation with member Indians. Williams v. Lee, 358 U.S. 217, 218, 223 (1959). Pelican concerned federal criminal jurisdiction over a non-Indian who murdered a member Indian in Indian country that had not been disestablished. United States v. Pelican, 232 U.S. 442, 444, 450 (1914). Kagama recognized the authority of the federal government to legislate and prosecute Indians within a State under an early version of the present-day Major Crimes Act. United States v. Kagama, 118 U.S. 375, 383-84 (1886). None of these are relevant to whether a State has concurrent criminal jurisdiction over an Indian in Indian country.

¶10 Instead, this Court dutifully applies the binding precedent of Castro-Huerta; Oklahoma has criminal jurisdiction in Indian country unless preempted. Castro-Huerta, 597 U.S. at 638. As the Court lays out in detail, no ordinary principle of federal preemption is applicable in this case. The Court then rightly turns to Bracker balancing and the final question, does the exercise of State jurisdiction unlawfully infringe on tribal self-government. Id.

II.

¶11 For reasons analogous to the U.S. Supreme Court's in Castro-Huerta, this Court comes to a similar, but narrower, conclusion: Tulsa's prosecution of O'Brien, a non-member Indian, for misdemeanor traffic offenses occurring on the public roads of Tulsa in Indian country does not unlawfully infringe on the Muscogee (Creek) Nation's self-government. However, it is at this point in the analysis that I must explain my reasoning and difference in resolution.

A.

¶12 First, the Court addresses the Muscogee (Creek) Nation's interest in self-government. It finds that the State's jurisdiction is concurrent and would not displace, nor diminish, the Tribe's prosecutorial authority to try Indians for violations of tribal law. Rather, the State's prosecution would bolster the Tribe's strong interest in public safety for its citizens. This is analogous to the rationale in Castro-Huerta for why concurrent State jurisdiction did not harm the federal interest in Indian country. Id. at 650-51.

¶13 Ultimately, the Court holds the State's prosecution of non-member Indians under these circumstances does not affect the Muscogee (Creek) Nation's authority to regulate its own citizens for violation of its laws. In fact, such a prosecution would not involve prosecuting any citizen of the Muscogee (Creek) Nation.

¶14 At first glance, the change from non-Indian to non-member Indian may appear materially different from Castro-Huerta since the tribe lacked prosecutorial authority over the non-Indian defendant in that case. Id. at 650; see also Oliphant v. Suquamish Tribe, 435 U.S. 191, 195 (1978). However, when analyzing U.S. Supreme Court precedent regarding the distinction between member and non-member Indians, it becomes clear that prosecution of non-member Indians does not implicate the self in tribal self-government. Non-member Indians are, for criminal jurisdiction purposes, similarly situated to non-Indians. Indian tribes are separate and distinct sovereigns, not a fungible amalgamation of Native American peoples.

¶15 When we look to criminal jurisdiction in Indian country, the U.S. Supreme Court precedent, as detailed below, has taken strong categorical approaches along three axes:

1) location is, or is not, Indian country;
2) Indian/non-Indian status of parties; and
3) member status of Indian parties.

These three considerations consistently define the extent of state, tribal, and federal interests.

¶16 The first of these, Indian country status, has been a mainstay of the jurisprudence and warrants little discussion beyond addressing its significance. The federal government has created Indian country under its plenary authority over tribal nations. Regardless of Indian status of a party, the State has criminal jurisdiction outside Indian country. Hagen v. Utah, 510 U.S. 399, 421-22 (1994) (after concluding petitioner was an Indian, the U.S. Supreme Court found the location of the crime was "not in Indian country and the Utah courts properly exercised criminal jurisdiction over him."); Organized Village of Kake v. Egan, 369 U.S. 60, 75 (1962) ("It has never been doubted that States may punish crimes committed by Indians, even reservation Indians, outside of Indian country."). Ultimately, the remaining questions are universally irrelevant if the location is not first fixed inside Indian country.

¶17 The second consideration, Indian/non-Indian status, informs broad classifications of jurisdiction. For example, despite being within Indian country, the State has criminal jurisdiction over non-Indian defendants. Castro-Huerta, 597 U.S. at 655 (states have concurrent jurisdiction with federal government over non-Indian that commits a crime against an Indian victim in Indian country); United States v. McBratney, 104 U.S. 621, 622-24 (1881) (enabling act states has jurisdiction over non-Indian defendants committing crimes against non-Indian victims in Indian country); People of State of New York ex rel. Ray v. Martin, 326 U.S. 496, 499 (1946) (original states without enabling act also have jurisdiction over non-Indian defendants committing crimes against non-Indian victims in Indian country).

¶18 Conversely, the tribes have no criminal jurisdiction over non-Indians without Congressional grant or recognition of authority. Oliphant, 435 U.S. at 212 (Indian tribal courts do not have criminal jurisdiction to try and punish non-Indian defendants absent Congressional grant or recognition of authority); 25 U.S.C. § 1304(b) and (c) (recognizing tribal concurrent jurisdiction with federal and state governments over non-Indians committing covered crimes, with certain exceptions, in Indian country).

¶19 The third consideration in criminal jurisdiction cases is tribal membership. More specifically, whether the tribal membership of the defendant matches the tribal affiliation of the Indian country where the crime was committed.

¶20 The U.S. Supreme Court held in Duro that tribes lacked jurisdiction over non-member Indians. Duro v. Reina, 495 U.S. 676, 688 (1990) (superseded by statute, 25 U.S.C. § 1301(2) as recognized in United States v. Lara, 541 U.S. 193 (2004)). Specifically,

[i]n the area of criminal enforcement, however, tribal power does not extend beyond internal relations among members. Petitioner is not a member of the Pima-Maricopa Tribe, and is not now eligible to become one. Neither he nor other members of his Tribe may vote, hold office, or serve on a jury under Pima--Maricopa authority. Cf. Oliphant, 435 U.S., at 194, and n. 4 . . . . For purposes of criminal jurisdiction, petitioner's relations with this Tribe are the same as the non-Indian's in Oliphant. We hold that the Tribe's powers over him are subject to the same limitations.

Id.

¶21 While Congress did pass legislation to recognize tribal authority over all Indians in 25 U.S.C. § 1301(2) (i.e. the so-called Duro fix statute), this legislation did nothing to eliminate the member versus non-member distinction, nor did it impact the underlying rationale of the U.S. Supreme Court in Duro going forward. Rather, the U.S. Supreme Court has continued to use Duro's rationale even after the superseding legislation, clearly indicating Congress merely changed the outcome as it applied to tribal jurisdiction over non-member Indians. However, the underlying rationale remains applicable. As recently as 2021, the U.S. Supreme Court used Duro to repeat their same concern regarding non-member Indians being subjected to laws that they had no say in creating--outside the protections and constraints of the U.S. Constitution. United States v. Cooley, 593 U.S. 345, 352-53 (2021). The U.S. Supreme Court would go on to equate non-member Indians to non-Indians for criminal jurisdiction purposes. Id.

¶22 Conversely, Indians became citizens of the United States and held voting rights in Oklahoma beginning in 1924. 8 U.S.C. § 1401(b) ("The following shall be nationals and citizens of the United States at birth: . . . (b) a person born in the United States to a member of an Indian . . . tribe . . . ."); Okla. Const. art. III, § 1 ("Subject to such exceptions as the Legislature may prescribe, all citizens of the United States, over the age of eighteen (18) years, who are bona fide residents of this state, are qualified electors of this state."). Even before then, Indians were also required to both elect and serve as delegates to form a constitutional convention for Oklahoma to become a state. Oklahoma Enabling Act Sec. 2, Chap. 3335, p. 267-68; See also Wah-tsa-e-o-she v. Webster, 1918 OK 212172 P. 78

¶23 The present case is demonstrative of the U.S. Supreme Court's rationale. Appellee--a non-member Indian--is a resident of Tulsa, Oklahoma, with a say in the laws applicable to him at both the municipal and State level. Conversely, there is no evidence that Appellee will ever qualify for citizenship, or be able to participate in tribal government, for the Muscogee (Creek) Nation to any extent to make him a federally recognized member of the tribe. See Barkus v. State, 2024 OK CR 25556 P.3d 633Duro, 495 U.S. at 693. ("It is significant that the Bill of Rights does not apply to Indian Tribal governments. . . . The Indian Civil Rights Act of 1968 provides some statutory guarantees of fair procedure, but these guarantees are not equivalent to their constitutional counterparts.").

¶24 While I acknowledge that tribes have since been recognized by Congress to have prosecutorial authority over non-member Indians, and even non-Indians, the U.S. Supreme Court's reasoning still demonstrates such powers are not core to tribal self-government. This strongly demonstrates that a non-member Indian does not trigger the core issue Bracker balancing seeks to protect in criminal cases: whether "the exercise of state jurisdiction would unlawfully infringe upon tribal self-government." Castro-Huerta, 597 U.S. at 649. Or put another way, "whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." McClanahan, 411 U.S. at 172 (quoting Williams v. Lee, 358 U.S. 217, 219-20 (1959)).

¶25 Undeniably, State prosecution does not infringe on the Muscogee (Creek) Nation's ability to make their own laws and to be ruled by them because the Appellee, a non-member Indian, is not a part of the law-making process, nor can he be. Simply stated, a non-member Indian is, for criminal jurisdiction purposes, similarly situated to a non-Indian. Duro, 495 U.S. at 688 ("For purposes of criminal jurisdiction, [as a non-member Indian,] petitioner's relations with this Tribe are the same as the non-Indian's in Oliphant.").

¶26 Ultimately, just as tribes lack criminal jurisdiction over non-Indians absent Congressional approval, so too do tribes lack criminal jurisdiction over non-member Indians absent the same Congressional approval. That targeted Congressional approval came with the Violence Against Women Act for tribal prosecution of non-Indians, and the Duro Fix for tribal prosecution of non-member Indians. Compare Oliphant, 435 U.S. 191 with Violence Against Women Act, 25 U.S.C. § 1304(b) and (c) and Duro, 495 U.S. 676 with Duro Fix, 25 U.S.C. § 1301(2). Precisely as described by the U.S. Supreme Court, absent Congressional action, non-Indians and non-member Indians have the same relationship with the tribe, and as such are the same for criminal jurisdiction purposes. Neither status, non-Indian nor non-member Indian, implicates tribal self-government.

¶27 As a result, the tribal interest identified in Castro-Huerta is largely the same as the one this Court identifies today. Therefore, just as concurrent State jurisdiction over a non-Indian in Castro-Huerta did not unlawfully infringe on tribal self-government, neither does concurrent State jurisdiction over a non-member Indian unlawfully infringe on the Muscogee (Creek) Nation's interest in self-government.

B.

¶28 Second, concurrent State jurisdiction does not harm the federal interest in ensuring public safety and criminal justice within Indian country. As this Court holds, federal jurisdiction over non-major crimes would be concurrent with State jurisdiction. State prosecution would supplement, rather than supplant, federal authority in Indian country. Again, while the focus has switched from Indian victims to non-member Indian defendants, much of the U.S. Supreme Court's rationale in Castro-Huerta applies. Id. at 650-51 ("State prosecution would supplement federal authority, not supplant federal authority."). And federal interest in ensuring public safety within Indian country is strongly tied to its interest in protecting Indian victims as identified in Castro-Huerta. This is evidenced by both the General Crimes Act and Major Crimes Act, each of which grant the federal government prosecutorial authority over Indians committing crimes within Indian country. See 18 U.S.C. §§ 1152 and 1153.

¶29 Moreover, concurrent State criminal jurisdiction is not contradictory to federal law and policy, rather it is consistent with and supports it. As both the U.S. Supreme Court held in Castro-Huerta and this Court holds today, no federal law acts to preempt State criminal jurisdiction in Indian country over non-major crimes. Even when Congress enacted the Duro fix to recognize tribal jurisdiction over non-member Indians, the U.S. Supreme Court recognized it did so without affecting State jurisdiction. Lara, 541 U.S. at 205 ("[T]his case involves no interference with the power or authority of any State."); see also 25 U.S.C. § 1301(2). Perhaps most tellingly is the federal government's relatively recent extension of criminal jurisdiction to tribes over covered criminal conduct by all persons with certain exceptions. 25 U.S.C. § 1304(b). This extended jurisdiction embraces concurrent federal and State jurisdiction. 25 U.S.C. § 1304(b)(2).

¶30 Finally, unlike the federal interest in the White Mountain Apache Tribe's logging and hauling operations, described by the U.S. Supreme Court in the Bracker case as comprehensive with day-to-day supervision by the Bureau of Indian Affairs, the same cannot be said regarding criminal jurisdiction in Indian country. Bracker, 448 U.S. at 145; see also Ramah Navajo School Bd., Inc. v. Bureau of Revenue of New Mexico, 458 U.S. 832, 843 (1982). To the contrary, State criminal jurisdiction in Indian country serves as the default assumption. Castro-Huerta, 597 U.S. at 653 ([T]he default is that States have criminal jurisdiction in Indian country unless that jurisdiction is preempted."); see also McBratney, 104 U.S. at 622-24; Martin, 326 U.S. at 500-01; Oliphant, 435 U.S. at 195.

¶31 All of this is consistent with the U.S. Supreme Court's finding in Castro-Huerta which recognized concurrent State jurisdiction in Indian country could further tribal and federal interests in protecting all people, Indian and non-Indian, from crime. As a result, concurrent State criminal jurisdiction over non-member Indians in Indian country would not unlawfully infringe on tribal self-government.

C.

¶32 Third, the State's interest is identical to the State's interest in Castro-Huerta, namely Oklahoma's police power. "[T]he State has a strong sovereign interest in ensuring public safety and criminal justice within its territory . . . . The State also has a strong interest in ensuring that criminal offenders . . . are appropriately punished and do not harm others in the State."Castro-Huerta, 597 U.S. at 651. The Court today seems to find the same interest, noting the reality of the State's interest in exercising its police power on public roadways to protect other motorists.

¶33 However, I would hold the State's interest in exercising its police power applies equally across all its territory within its borders for the protection of all citizens, regardless of their Indian status. To the extent that courts may interpret today's decision to recognize a variable evaluation of the State's interest based on location and who holds primary law enforcement responsibilities, that would be a mistake and would serve only to sow unending confusion. While I do not believe the Court embraces this outcome today, I do believe it fails to do enough to foreclose this dangerous rationale. Instead, the Court does little to provide lower courts the appropriate tools to engage in Bracker balancing in the cases to come by leaving the State's interest poorly defined and nebulous.

¶34 As such, I would not relegate the State's interest to a heat map of primary law enforcement responsibilities, potentially subject to change on the malleability of superficial line drawing. Rather, I would recognize the true State interest: full exercise of its police power, inherent and central to every sovereign State.

D.

¶35 Fourth and finally, we must evaluate the interests identified to answer the ultimate question posed by Bracker balancing: whether the exercise of State authority unlawfully interferes with tribal self-government. However, I believe additional context is necessary before we answer this question. After all, the Bracker "preemption test is a flexible one sensitive to the particular state, federal, and tribal interests involved." Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 184 (1989) (citing Ramah Navajo School Bd., 458 U.S. at 838; Bracker, 448 U.S. at 145).

¶36 Oklahoma's exercise of criminal jurisdiction in Indian country for over a century warranted neither Congressional correction nor tribal objection. Castro-Huerta, 597 U.S. at 647 (citing McGirt v. Oklahoma, 591 U.S. 894, 967-68 (2020) (Roberts, C.J., dissenting)).Bracker balancing, and while I do not believe it is dispositive, it certainly informs our analysis.

¶37 Returning to the formation of the Bracker balancing question, while the Court asks and answers a narrow version of this question specific to Tulsa's concurrent jurisdiction over misdemeanor traffic offenses on public roadways against the Muscogee (Creek) Nation's self-government, my examination yields a different question, and thus a different answer.

¶38 Based on my preceding analysis, I would ask the following:

Does the State's exercise of concurrent criminal jurisdiction over non-member Indians in Indian country unlawfully infringe on tribal self-government?

¶39 Considering each of the three interests in answering the Bracker balancing question, the result is clear: a resounding no, just as in Castro-Huerta. Ultimately, State prosecution of non-member Indians in Indian country, as part of its concurrent jurisdiction with federal and tribal law enforcement, would enhance the interests of each sovereign responsible for public safety within Indian country. Bracker balancing will not be different in any application of concurrent State criminal jurisdiction over a non-member Indian committing a non-major crime in Indian country because State jurisdiction over a non-member Indian does not unlawfully interfere with tribal self-government. Duro, 495 U.S. at 688 ("For purposes of criminal jurisdiction, [as a non-member Indian,] petitioner's relations with this Tribe are the same as the non-Indian's in Oliphant."). "[N]onmembers, who share relevant jurisdictional characteristics of non-Indians, should share the same jurisdictional status." Duro, 495 U.S. at 696 (emphasis added).

¶40 Although Congress has since recognized tribal authority over non-member Indians, state authority over non-Indians and non-member Indians implicates the same interests in tribal self-government: "A tribe's power to prescribe the conduct of tribal members has never been doubted, and our cases establish that 'absent governing Acts of Congress,' a State may not act in a manner that 'infringed on the right of reservation Indians to make their own laws and be ruled by them.'" New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 332 (1983) (quoting McClanahan, 411 U.S. at 171-72) (emphasis added). Ultimately, a non-member Indian, just as a non-Indian, does not implicate the self in self-government for criminal jurisdiction purposes.

¶41 It is here that my divergence from the Court comes into focus. That difference has less to do with the analysis and more to do with our views on judicial restraint. The Court has prioritized resolving the narrow case before us and thus a limited and piecemeal application of Bracker balancing. Because of this application, the Court narrowly holds that Tulsa is not barred from prosecuting misdemeanor traffic crimes committed by non-member Indians on the Muscogee (Creek) reservation when those offenses occur on public roads and streets within Tulsa's city limits. This approach improvidently leaves lower courts, and this Court, to decide case-by-case vital issues of public safety, determining piecemeal which Oklahoma citizens enjoy the protection of their sovereign and leaving each of the three interested governments (tribal, federal, and State) to guess where their responsibilities lie.

¶42 Instead, my view on judicial restraint in this area of law calls for us to widen the scope and recognize that a defendant's non-member Indian status so dominates the Bracker balancing analysis that it necessarily controls the result. Duro, 495 U.S. at 696 ("[N]onmembers, who share relevant jurisdictional characteristics of non-Indians, should share the same jurisdictional status."). Doing so recognizes that Bracker balancing is not a typical statutory preemption under the Supremacy Clause, but rather a judicially created--common law--preemption, unique to Indian country. It is an awesome power reserved to a court to interpret the interests of tribal, federal, and state sovereigns, absent controlling language from Congress, to preempt state authority. In this case, it is the power to decide when and where Oklahoma can and cannot act like a state; when and where Oklahoma can exercise its core police power central to its sovereignty.

¶43 My views on judicial restraint and the judiciary's role in Bracker balancing preemption compels me to limit the use of this power by asking a broader question where possible, thus arriving at a more comprehensive conclusion. By doing so, I would answer important and pressing questions about each of the three sovereigns' responsibilities in Indian country; avoid holding the State's police power hostage to a myriad of interpretations below; and limit the frequency courts use this power, properly reserving it for the rare occasions state jurisdiction may actually infringe on tribal self-government.

¶44 However, while the Court does not adopt my conclusion, the analysis that leads to it is not excluded from the Court's holding today. Oklahoma, the tribes, and the federal government must instead wait for the next case--or next several cases--to learn the balance of criminal jurisdiction in Oklahoma.

 

FOOTNOTES

See generally General and Major Crimes Acts, 18 U.S.C. §§ 1152 and 1153.

Cooley:

We also note that our prior cases denying tribal jurisdiction over the activities of non-Indians on a reservation have rested in part upon the fact that full tribal jurisdiction would require the application of tribal laws to non-Indians who do not belong to the tribe and consequently had no say in creating the laws that would be applied to them. See Duro, 495 U.S. at 693 . . . (noting the concern that tribal-court criminal jurisdiction over nonmembers would subject such defendants to "trial by political bodies that do not include them"); Plains Commerce Bank [v. Long Family Land and Cattle Co.], 554 U.S. [316,] 337 . . . [(2008)] (noting that nonmembers "have no part in tribal government" and have "no say in the laws and regulations that govern tribal territory").

Cooley, 593 U.S. at 352-53.

Barkus, 2024 OK CR 25Barkus involved a Seminole Freedman in the Muscogee Creek Nation (Hughes County), the outcome of the case would be unchanged if the crime occurred in the Seminole Indian Reservation because the defendant would still fail to meet the Rogers test. United States v. Rogers, 45 U.S. 567 (1846); see also Wadkins v. State, 2022 OK CR 2504 P.3d 605Parker v. State, 2021 OK CR 17495 P.3d 653

McGirt, 591 U.S. at 967-68 (Roberts, C.J., dissenting).

 

 

LUMPKIN, JUDGE, SPECIALLY CONCURRING:

¶1 I want to compliment my colleague on a very scholarly and legally correct opinion on this very complex subject. The concepts of Indian tribal sovereignty, subject matter jurisdiction, and concurrent jurisdiction are each singularly challenging subjects to navigate but when combined into a single factual case the issues become even more complex.

¶2 The term, "tribal sovereignty," has for too long been used in an overly broad manner. If applied under the interpretation urged by the Appellee and Amicus, Oklahoma could functionally cease to be a State. But as the Supreme Court set out in Castro-Huerta, a tribe may have qualified sovereignty over tribal matters within its designated reservation, but the reservation is part of the State, not vice versa. This is a limited sovereignty as allowed by Congress and as interpreted by the Supreme Court, with the tribes still bound by federal and state law. Cf. Chickasaw Nation v. United States, 534 U.S. 84, 87-88 (2001) (holding Indian tribes, unlike states, are not exempt from paying federal taxes on gaming operations). As Chief Justice Marshall said in Cherokee Nation v. Georgia, 30 U.S. 1 (1831), to-wit:

The Indian territory is admitted to compose a part of the United States. In all our maps, geographical treatises, histories, and laws, it is so considered. In all our intercourse with foreign nations, in our commercial regulations, in any attempt at intercourse between Indians and foreign nations, they are considered as within the jurisdictional limits of the United States, subject to many of those restraints which are imposed upon our own citizens. They acknowledge themselves in their treaties to be under the protection of the United States; they admit that the United States shall have the sole and exclusive right of regulating the trade with them, and managing all their affairs as they think proper; and the Cherokees in particular were allowed by the treaty of Hopewell, which preceded the constitution, 'to send a deputy of their choice, whenever they think fit, to congress.' Treaties were made with some tribes by the state of New York, under a then unsettled construction of the confederation, by which they ceded all their lands to that state, taking back a limited grant to themselves, in which they admit their dependence.

Though the Indians are acknowledged to have an unquestionable, and, heretofore, unquestioned right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government; yet it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly, perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian.

They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their great father. They and their country are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States, that any attempt to acquire their lands, or to form a political connexion with them, would be considered by all as an invasion of our territory, and an act of hostility.

Id., 30 U.S. at 17--18.

¶3 Therefore, an analysis must be made to determine what, if any, interference with internal tribal matters occurs when a city located on Indian land charges an Indian with a misdemeanor traffic ticket. As I have said before it would be hard to imagine any action by a state entity in enforcing its traffic safety laws on state or municipal roads interfering with internal tribal matters.

¶4 This Court answered the question of subject matter jurisdiction in our recent case of Deo v. Parish, 2023 OK CR 20541 P.3d 833White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 144-45 (1980), that we may determine whether the City of Tulsa's exercise of jurisdiction over a traffic violation infringes upon tribal sovereignty. We set out the Bracker balancing analysis in Deo, 2023 OK CR 20Oklahoma v. Castro-Huerta, 597 U.S. 629, 649-51 (2022), as follows: "(1) whether the exercise of state jurisdiction would infringe on tribal self-government, (2) whether state prosecution would harm the federal interest in protecting Indians, and (3) the strength of the state's interest in ensuring public safety and criminal justice within its territory."

¶5 The opinion conducts this analysis and determines no infringement in any internal tribal matter occurs due to the city's exercise of jurisdiction over the traffic violation. Truly, how could Tulsa's enforcement of traffic laws that protect both Indian and non-Indian harm or detract from any internal tribal matter? Tribal members are citizens not only of their tribe, but also of their state and of the United States. Accordingly, they are obligated to obey the laws of each entity.

¶6 This leaves the court with the concept of concurrent jurisdiction. This is nothing new as the states and Federal Government have shared concurrent jurisdiction for decades. They apply it easily, each respecting the other and applying the separate sovereign doctrine as appropriate,

¶7 This opinion only points out what the law is and recognizes the authority of each party under existing law. The Supreme Court in Castro-Huerta not only set forth the status of Indian tribes and reservations in Oklahoma, but also corrected misperceptions of the law in McGirt and provided guidance as to the course the State should follow in future cases. So too does this opinion in a very clear, straight-forward manner, and I join in its analysis and holding.

 

FOOTNOTES

See Denezpi v. United States, 596 U.S. 591, 598-99 (2022) (explaining where a single act offends two laws from two different sovereigns, including Indian tribes, each law proscribes a separate offense and prosecution for each does not violate double jeopardy concerns).

 

 

LEWIS, JUDGE, CONCUR IN PART AND DISSENT IN PART:

¶1 I concur that the City's telephonic notice of appeal and the nature of the trial court's order authorize the City's appeal; that Appellee's challenge to the trial court's jurisdiction was timely; and that the City's Curtis Act argument is without merit. However, I respectfully dissent to the remainder of the opinion for reasons I have stated before.

¶2 Oklahoma has no jurisdiction of crimes committed by Indians in Indian Country unless it is expressly conferred by Congress. See Fisher v. District Court, 424 U.S. 382, 386 (1976); DeCoteau v. District County Court, 420 U.S. 425, 427 n.2 (1975); McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 170-172 (1973); Williams v. Lee, 358 U.S. 217, 220 (1959); United States v. Pelican, 232 U.S. 442, 449-450 (1914), and United States v. Kagama, 118 U.S. 375, 383-384 (1886). No subject matter jurisdiction, no personal jurisdiction, no territorial jurisdiction, no exclusive jurisdiction, no concurrent jurisdiction. No criminal jurisdiction.

¶3 Congress has never granted criminal jurisdiction over Indians in Indian Country to the State of Oklahoma. Ross v. Neff, 905 F.2d 1349, 1352 (10th Cir. 1990). The Supreme Court cannot create such jurisdiction from a footnote to Castro-Huerta; and this Court cannot conjure it from the application of Castro-Huerta and Bracker to an Indian defendant's prosecution for offenses in the City of Tulsa, which lies entirely within Indian Country.

¶4 This case is not really about complex concepts of subject matter, territorial, or personal jurisdiction; it is about the fact that Indian Country got a whole lot bigger after McGirt. "Historically, the conduct of Indians and interests in Indian property within Indian Country have been matters of federal and tribal concern. Outside Indian Country, state jurisdiction has obtained." Ahboah v. Housing Auth. of the Kiowa Tribe, 660 P.2d 625Castro-Huerta, 597 U.S. 629, 657, 142 S.Ct. 2486, 2505 (2022) (Gorsuch, J., dissenting). Castro-Huerta diminished that principle only as to non-Indians who commit crimes against tribal members in Indian Country.

¶5 Today, without Congressional authorization, this Court authorizes the criminal prosecution of Indian defendants in the municipal court of a state political subdivision that lies entirely within Indian Country. And while many of the Court's essential points about state sovereignty and territorial jurisdiction and pre-emption and the General Crimes Act make some sense in the context of the actual holding in Castro-Huerta, these premises are non-sequiturs in the Court's appraisal of the state's jurisdiction to prosecute Indians in Indian Country.

¶6 That is to say, it simply does not follow from the territorial or pre-emption premises of Castro-Huerta that Oklahoma's political subdivisions may assume the criminal prosecution of Indians in Indian Country without express Congressional approval. Even the dissent in Castro-Huerta acknowledged what the Supreme Court had not done: it had not recognized Oklahoma's jurisdiction to prosecute Indians under Public Law 280; it had not recognized such power as inherent in Oklahoma's sovereignty; and it had not held that Oklahoma statehood conferred sovereign power to try Indians for crimes in Indian Country. Castro-Huerta, 597 U.S. at 692-94 (2022) (Gorsuch, J., dissenting). Castro-Huerta had, indeed, left "undisturbed the ancient rule that States cannot prosecute crimes by Native Americans on tribal lands without clear congressional authorization--for that would touch the heart of 'tribal self-government.'" Id., 597 U.S. at 693 (Gorsuch, J., dissenting).

¶7 This Court today admits no such constraints on its reading of Castro-Huerta and other supposed authorities. It means to touch the heart of tribal self-government if it can, for it reads Castro-Huerta, et al, to authorize the City's infringement of perhaps the most central principle of tribal sovereignty: the right of Indians to make and enforce their own laws and remain free from a state's criminal agents, prosecutors, and courts unless expressly approved by Congress. The Court premises that infringement upon a cursory Bracker balancing carried off without an adequate evidentiary record concerning the practical impacts of its ruling on tribal sovereignty; indeed, without even the formality of oral argument as requested by the Indian tribes appearing (with no small irony) as amicis curiae.

¶8 And the Bracker balance being struck here all-too-predictably aggrandizes the state's prerogatives at the tribe's expense: The prosecutions are (for now) only of non-Muscogee Creek Indians; the Tribe is faulted for failing to identify in its briefs any "specific interests" it wants this Court to weigh; allowing the City to prosecute Indians will advance tribal public safety even over tribal objections; if state prosecutions of non-member Indians on the Muscogee Creek Reservation "poses a problem," Congress can fix it later; the City's prosecution of non-Muscogee Creek Indians in Indian Country advances city, and thus state and federal, public safety interests, and so on.

¶9 In sum, the Court today prefers the illusion of jurisdictional complexity to the clear implications of McGirt and the longstanding principles of tribal sovereignty. If all of this was the intent of the Supreme Court's second footnote to Castro-Huerta, I shall wait to hear them say it. I respectfully dissent.